ELOISE P. DeWEESE ET AL *v.* MILTON NEVIL WILLIAMS ET AL

73-164                                                   502 S.W. 2d 94

Opinion delivered December 17, 1973

*Haley & Claycomb,* for appellants.

*Lawrence Blackwell,* for appellees.

J. FRED JONES, Justice. This appeal is from a chancery court decree partitioning 157 acres of Jefferson

County land among the descendants of Louisa J. Williams who died intestate in 1898. It is admitted by all concerned that Warren E. Williams was a surviving child and lawful heir of Louisa J. Williams. This case turns on the question of whether Ida V. Williams West was also a child and heir at law of Louisa J. Williams, or whether she was only a foster child reared in the Williams home. The chancellor found that Ida was also a child and lawful heir of Louisa J. Williams and shared equally with Warren in Louisa's estate.

Warren E. Williams died intestate in September, 1942, and left five children, Birdie W. Parker, Milton Nevil Williams, Mabel W. Seamans, Idell W. Bussey and Warren Edgar Williams, Jr., as his sole surviving heirs. Ida Williams West died intestate in 1953 and left one daughter, Nola W. Fetsch, as her sole surviving heir at law. Birdie W. Parker died intestate in September, 1969 and left surviving her husband, I. V. Parker, and four children, Eloise P. DeWeese, Virginia P. Calaway, Walter C. Parker and Dorothy M. Parker, as her sole surviving heirs at law. Dorothy died in 1971 leaving only her father, I. V. Parker, as her sole surviving heir.

Milton Nevil Williams has been in posssssion of the property here involved for a number of years and on April 22, 1958, he was appointed guardian of the person and estate of his brother, Warren E. Williams, Jr., who was mentally incompetent. On August 11, 1970, under a probate court order authorizing a private sale, he executed a guardian's deed conveying an undivided one-tenth interest in the described real estate to his sisters, Mabel W. Seamans and Idell W. Bussey. On June 16, 1971, Mabel W. Seamans conveyed all her undivided interest in the land to Milton by warranty deed, and on February 3, 1970, Milton obtained a quitclaim deed from Nola Fetsch conveying to him all her interest in the land as the sole surviving heir of Ida Williams West and Milton now claims a three-fourths undivided interest in the property.

This action was commenced on August 4, 1971, when the above named heirs of Birdie Parker filed petition for a partition of the property naming the remaining Williams heirs as parties defendant. They

alleged that the property descended from Louisa J. Williams to her only child, Warren E. Williams, and through him to the Williams heirs including their mother, Birdie Williams Parker, in undivided one-fifth interests. They alleged that when their mother, Birdie Parker, died intestate, they inherited her one-fifth undivided interest in the property; that they each own an undivided one-fourth interest in the undivided one-fifth interest in the property owned by their mother subject to the curtesy rights of their father, I. V. Parker. The petition alleged that the parties had never been able to agree on a division of the property since the death of Birdie W. Parker, and alleged that Milton had wrongfully used and occupied the premises for his own personal use and in partnership with others since August, 1956. They alleged that they were entitled to an accounting for fair rental value, the timber harvested and government payments received. They prayed for a partition in kind or in the alternative that the property be sold and the proceeds divided according to the interests of the parties.

Milton filed an answer admitting the relationship of the parties and the death and intestacy of Birdie W. Parker as alleged in the petition. He admitted the petitioners are each entitled to one-fourth of the interest owned by Birdie W. Parker. Milton alleged, however, that Louisa J. Williams died intestate on August 4, 1898, survived by *two children,* Warren E. Williams and *Ida V. Williams West,* as her sole surviving heirs at law. He alleged that Ida V. Williams West died intestate on June 3, 1953, leaving one child, Nola Fetsch, as her sole surviving heir at law. He alleged that by inheritance and purchases he became the owner of an undivided three-fourths interest in the property described in the petition and that he acquired such interest as follows:

"By inheritance from Warren E. Williams, an undivided 10%. By purchase from Nola West Fetsch, sole heir at law of Ida Williams West . . . an undivided 50%. By purchase from Mabel W. Seamans ... an undivided 15%."

Milton then alleged that no demand for rents had ever been made and denied that any timber had been

harvested from the land except when damaged by fire or ice. He then alleged improvements to the land in the amount of $11,500, taxes paid in the amount of $903.10 and prayed that these expenditures be taken into consideration in the event of partition. He then alleged that he, together with Birdie Parker and Mabel Seamans, had previously conveyed their interest in other lands to Idell W. Bussey by quitclaim deed with a provision in the deed that the conveyance should be taken into consideration in determining Mrs. Bussey's interest in the lands here involved at the time of division of the estate properties of Warren E. Williams, deceased, and he prayed that this be done. The petitioners filed a reply to the affirmative allegations of Milton in which they specifically denied that Louisa J. Williams was survived by "two" children. They denied that Ida was a child or heir of Louisa J. Williams by birth or adoption and they joined issues with Milton's allegations of improvements.

As already stated, the chancellor found that Ida V. Williams West was the daughter of Louisa J. Williams and John J. Williams, and that upon the death of Louisa J. Williams the title to the property passed to Warren E. Williams and Ida V. Williams West as tenants in common, with each of them owning an undivided one-half interest in the property. The chancellor found the interests of the parties in the property to be as follows:

"Idell W. Bussey, an undivided 15%.
Milton N. Williams, an undivided 75%.
Walter C. Parker, an undivided 2.5%.
Eloise P. DeWeese, an undivided 2.5%.
Virginia P. Calaway, an undivided 2.5%.
I. V. Parker, an undivided 2.5%."

The chancellor then ordered a partition of the property according to the interests found, and appointed Commissioners with directions to determine whether the property is subject to division in kind or should be sold and the proceeds divided. He then reserved the other issues for determination pending the report of the Commissioners.

On their appeal to this court, the Parker heirs first contend that the chancellor committed five specific errors pertaining to the admission and exclusion of documentary evidence. They next contend the chancellor's finding that Ida V. Williams West was a daughter and surviving heir of Louisa J. Williams was against the preponderance of the evidence. We agree with the appellants on this second contention, so we consider it unnecessary to discuss the admissions and exclusions of the evidence under the appellants' first contention.

The oral testimony of all the parties and the witnesses pertaining to the relationship of Ida V. Williams West to Louisa J. Williams, was simply based on their understanding and belief favorable to their side of the issue and we consider it unnecessary to set out the testimony in detail. The Parker heirs and their witnesses testified that they had always considered, understood and believed Ida to be an unrelated foster child reared in the home of Louisa J. Williams as one of the family and that she was never an heir at law of Louisa J. Williams, either by blood or adoption. Milton and the other Williams heirs and their witnesses testified that they had always considered, understood and believed that Ida was a child and heir of Louisa J. Williams; that she was a blood sister to Warren E. Williams and shared equally with him in the estate of Louisa J. Williams. Both sides introduced ancient letters and documentary evidence in support of their respective understandings and beliefs. The appellee Williams heirs offered numerous ancient family letters, census reports, funeral attendance records, autograph books, etc. in which Ida was addressed or referred to as daughter, sister or cousin. All of this evidence indicates that Ida was considered, loved and accepted as a member of the Williams family by all parties concerned, but it falls far short as proof of legal relationship by blood or adoption to Louisa J. Williams. The Parker heirs also offered considerable documentary evidence in support of their own contentions and tending to impeach the credibility of Milton's testimony and that of his surviving sisters to the effect that they had always considered and believed Ida to be their blood aunt by birth as the daughter of Louisa J. Williams. The most cogent

evidence as to Ida's relationship, or lack of relationship, to Louisa J. Williams is contained in a letter written to Birdie Parker in Ida's own handwriting on May 9, 1943. This letter was introduced into evidence without objection and its authenticity is not questioned. Its importance to our decision, however, justifies a few words of background for the context in which it was written.

It is clear from the record that in the mid 1930's Warren E. Williams mortgaged the property here involved to Taylor & Company as security for a loan and the indebtedness had not been paid at the time of his death. The record indicates that Taylor & Company wrote several letters to Milton as well as to his sister, Birdie Parker, concerning the indebtedness. The letters brought no response from Milton but Mrs. Parker did respond and under veiled threats of foreclosure in 1943, she paid the balance due on the mortgage indebtedness. It is apparent from the record that Mrs. Parker was concerned about the possibility of losing the property through foreclosure but also questioned the wisdom of making payments for the benefit of all the heirs and she corresponded with Ida in connection with the matter. The letter from Ida to Mrs. Parker, above referred to, reads in part as follows:

"Well, honey, I just *don't know what* to say or how to say it. Yes I think that you or someone will have to take hold of the problem, for things can't wait always. Yes, Taylor & Company can foreclose or force a sale most any time. I think they have been mighty nice as it is. I sure hope things will work out o.k. You be sure you always get receipts for things you pay & *keep* them, or dates and copies of them, if U have to give others receipts. . . .

Be sure you keep in the law in it *all.* I think Christopher would be a good guide for U. Yes, I know that W.E. would say keep the old home at any cost. I say so too. I don't know weather [sic] to say this or not. But if things get messed up too much U know, *(it might be that I could come in for ½ of that. If the records show that I was adopted. It would be*

*about 1877 or near that. I don't want a thing. But if need be it might help.)* C. don't mention *this* to anyone.

Yes, I would pay the mortgage off, and hold it, and interest, till I got mine. I sure hope it don't pass into other hands.

You know that is about' the best farm around there and a lot of the very best ground has been allowed to grow up in brush, along the road across the creek; it used to be in cultivation don't look like it now. Watch it & don't let anyone else get the mortgage. I hope I am not butting in . . . ." (Our emphasis in parenthesis added).

This letter from Ida contains the only direct evidence in the record as to the actual relatonship, or lack of it, between her and Louisa J. Williams.

Of course, if Ida had been born as one of the two children of Louisa J. Williams, she wuld have inherited an undivided one-half interest in the property without question, and it is reasonable to assume that the question of adoption for that purpose, would never have occurred to her. When this letter is considered in connection with the Taylor & Company demands for payment directed to Mrs. Parker over a seven year period from 1936 to 1943, it adds credence to the Parker heirs' belief that Ida was a foster daughter of their great grandmother, Louisa J. Williams, and was not a sister by blood or adoption to their grandfather, Warren E. Williams.

Ida's marrige license in evidence indicates it was issued in 1908 to G. B. West and Miss Ida Williams, then 31 years of age. But the death certificate dated July 1, 1953, recites that Mrs. Ida West died on June 30, 1953, at the age of 78 years, and recites that on information furnished by Mrs. Nola Fetsch, the name of Mrs. West's father was John Williams and the name of her mother was unknown.

In the light of the above  letter from Mrs. Ida West, we are unable to overlook as careless errors some of

the transactions between the parties. On March 23, 1959, Milton Nevil Williams and two of his sisters, executed a quitclaim deed to their sister Idell W. Bussey, containing the following recitation: ". . .[W]e, Milton Nevil Williams and Eloise Williams, his wife, Birdie W. Parker, and Mabel W. Seamans, Grantors, *being all the heirs at law of one W. E. Williams, deceased, except for Warren Edgar Williams, an incompetent, and the Grantee herein*, . . . do hereby grant, sell and quitclaim. . . ." (Emphasis added).

We note that in Milton's verified petition for guardianship filed on April 18, 1958, he represented Warren's interest in the land as an undivided one-fifth interest, whereas his petition to sell the interest filed on July 30, 1970, and the subsequent sale on Agust 11, 1970, represented that interest as an undivided one-tenth interest. We also note that in the meantime, on February 6, 1970, Milton had recorded a quitclaim deed executed in the state of Missouri on February 3, 1970, by "Nola West Fetsch sole heir of Ida Williams West" conveying to Milton all her right, title and interest in the lands here involved. Milton readily admitted that he paid Mrs. Fetsch nothing for her interest in the land, but he explains that she was simply interested in assisting him in caring for his incompetent brother, Warren.

This case was well tried by the chancellor as well as the attorneys involved, but we disagree with the chancellor as to where the preponderance of the evidence lies. As we view the chancery record in this case on trial de novo, we conclude that the chancellor's finding that Ida Williams West was the daughter and heir at law of Louisa J. Williams is against the preponderance of the evidence and the chancellor's decree must be reversed. It is clear that the chancellor left some issues to be determined following the report of the Commissioners he appointed as above set out, so the decree is reversed and this cause is remanded to the chancery court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

HARRIS, C.J., dissents.

CARLETON HARRIS, Chief Justice, dissenting. I recognize that this is a close case, with some rather convincing items of evidence on both sides, but I certainly cannot say that the findings of the chancellor were clearly against the preponderance of the evidence. We have said on divers occasions that we will not reverse a chancellor unless his findings are clearly against the preponderance of the evidence. See *Hampton* v. *Hampton,* 245 Ark. 579, 433 S.W. 2d 149. The reasoning behind these holdings is that the chancellor, who sees the parties and their witnesses, and observes their demeanor while testifying, is in a better position to evaluate the credibility of their testimony.

The majority opinion seems to be mainly predicated on the purported letter written by Ida V. Williams West, but, to me, the letter does not carry the weight, significance, or importance, that is attached to it by the majority.

Let it be remembered that everything that an individual knows about his ancestry is acquired from hearsay evidence; he knows what he has been told; he cannot say of his own knowledge where he was born or to whom he was born. Whatever Mrs. West thought about her ancestry had to come from other persons. To me, what an older brother or sister, or other close relative, says, is much more persuasive. Here, as will later be discussed, Warren E. Williams, Sr.,[1] admittedly a son of Louisa, clearly demonstrated that certainly it was his belief that Ida was his blood sister.

In this case, Mrs. Mabel Seamans, one of the children of Warren E. Williams, Sr., testified that she knew her aunt, Mrs. West, all of her life and that this aunt lived in the Williams home in the early days part of the time. She testified positively that Mrs. West was her father's blood sister. She stated that she had heard her aunt request many times to be buried at the foot of her mother's grave, meaning Louisa Williams—and Mrs. West is actually buried there. She also testified that she observed her father's funeral record, which reflected the relatives attending the funeral and that Mrs. West was listed as a sister. This exhibit was offered in evidence and the entries on the funeral record were placed there by Eloise DeWeese,

---

[1]Warren E. Williams was thirteen years older than Ida.

*one of the appellants herein.* Milton Nevil Williams testified that he always understood that Mrs. West was his father's blood sister, and he never had any indication of any other relationship from his father, mother, or aunt. He said the first time that he ever heard anything to the contrary was "drifting words" around 1953 when his aunt died. He also testified that during the football seasons of 1933 and 1934, he lived with this aunt. These two witnesses testified from direct knowledge of the relationship of Ida West to their father, and as Warren Williams, Sr.'s own children, they, it would appear, had a much greater opportunity to know the facts than the grandchildren. Also, to me, the testimony of Mrs. Seamans and Williams was much more convincing for the testimony from appellants was far less positive. For instance, Eloise DeWeese testified that according to *her understanding,* Warren Edgar Williams was the only child of Louisa J. Williams. Likewise, Virginia P. Calaway, also a granddaughter of Warren E. Williams, Sr., testified that it was *her understanding* that Ida West was raised by John J. and Louisa Williams, but was not legally adopted. Walter Parker, brother of Mrs. DeWeese and Virginia P. Calaway, testified that it was *his impression* that Ida Williams West is a foster daughter.

Certainly there was one person who lived during the lifetimes of these witnesses who should have known his relationship to Ida West and that was Warren Williams, whose every action indicated that she was his sister. On two occasions, Warren and Ida joined in trust deeds dealing with the lands in question; a 1932 deed of trust recited that Warren and wife and Ida V. Williams West were the sole heirs at law of Louisa J. Williams, deceased. Why would Warren E. Williams have his sister join in the execution of these conveyances unless she did in fact bear the relationship of daughter to Louisa Williams and was actually his blood sister? In addition, there were other exhibits which, in my view, clearly establish what Warren E. Williams thought about the matter. A letter was offered, dated December 13, 1908 from Williams to Ida V. Williams (West), wherein he addressed her as "Dear Sis", and concluded his letter with the expression, "From your Bud, W. E. Williams." Another exhibit was a "correspondence box", which was given to Ida by Warren Williams as a Christmas present

in 1891. In the bottom of the section containing the ink well, Warren E. Williams inscribed, "To Ida, from her Brother, Warren E. Williams, Christmas, 1891."

The evidence contains a written communication from Louisa J. Williams to Ida in the form of an entry in an album addressed to "Dear Ida", and closing with the words "and take what God sends is the wish of your mother, Louisa J. Williams." There was also an authenticated copy of a Federal Census Report of 1880, that I deem to be admissible,[2] which reflected that Ida was the daughter of John and Louisa Williams and I consider this admissible hearsay relative to the pedigree of the children of the Williams family, since this information had to be given to the census taker by some member of that family.[3]

Without mentioning other items of evidence, suffice it to say that I cannot agree, as originally stated, that the findings of the chancellor were clearly against the preponderance of the evidence. Accordingly, I would affirm the decree.

---

[2]See Ark. Stat. Ann. §§ 28-931 and 28-932 (Repl. 1962).
[3]Ida was five years of age at the time of the census.